UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

WILLIAM D. CHAPMAN,

                                Plaintiff

-vs-

THE PLAN ADMINISTRATION COMMITTEE OF
CITIGROUP, INC., CIGNA LIFE INSURANCE
COMPANY OF NEW YORK, a/k/a CIGNA GROUP
INSURANCE, a/k/a CIGNA WORLDWIDE
INSURANCE CO., a/k/a INA LIFE INSURANCE
COMPANY OF NEW YORK, and CITIGROUP, INC.,
a/k/a CITIGROUP,

                                Defendants

DECISION AND ORDER

06-CV-6444 CJS

_____

APPEARANCES

| | |
|---|---|
| For Plaintiff: | Lawrence I. Heller, Esq.<br>1 East Main Street, Suite 950<br>Rochester, New York 14614 |
| For Defendant: | Kevin Horbatiuk, Esq.<br>Russo, Keane & Toner, LLP<br>26 Broadway, 28th Floor<br>New York, New York 10004 |

INTRODUCTION

    This is an action to recover long-term disability insurance benefits, brought pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* Plaintiff, who claims to be disabled due to coronary disease and psychological problems, contends that Defendant's decision denying him benefits was arbitrary and capricious. Now

1

before the Court is Plaintiff's motion for summary judgment [#10]. For the reasons that follow, Plaintiff's application is granted and this matter is remanded for further proceedings.

## BACKGROUND

The issue presented in this case is whether Defendant arbitrarily and capriciously denied Plaintiff long-term disability benefits. Under the relevant plan, Plaintiff is entitled to receive such benefits "if because of Injury or Sickness, he [was] unable to perform all the essential duties of his occupation." (Cigna Life Insurance Company of New York Claim File ("CLICNY") 0112). On this point, the following are the relevant facts of the case, viewed in the light most-favorable to the non-moving Defendant.

Plaintiff was employed by Salomon Smith Barney as a Financial Consultant for several years prior to 2004. Plaintiff's supervisor described the requirements of that position, in relevant part, as follows:

> On numerous occasions, Bill has requested an official job description from Smith Barney. Interestingly, there is no such description in our system because financial consultants have many styles of demonstrating their entrepreneur skills. . . . [Financial consultants] are required to develop marketing plans and strategies to attract new clients. They must be proficient at analyzing a client's financial position and implement an appropriate course of action. They must handle the volatility of the markets and maintain composure for themselves and their clients.
>
> The typical activities utilized by financial consultants to acquire and service their clients include the following: Analyze investment opportunities and client needs[;] Prospect and service clients through phone contact, personal appointments, (here and at clients home or business), seminars and networking[;] Attend training and educational programs on and off site to maintain licenses and other skills necessary in the profession[.]
>
> ***
>
> [The] actual job requirements are broader than simply a desk job. [A financial consultant] must be able to travel to clients, seminars and training. Unlike many executive positions, the financial consultant is much closer to an independent sales person than an administrator.

2

(CLICNY 184-85).[1] With regard to work activities outside of the office, Plaintiff provided Defendant with evidence that he met with each of his hundreds of clients in their homes annually (CLICNY 0184), and that he played golf and/or shot skeet with clients at least three days per week. (CLICNY 0347). Plaintiff indicated, for example, that his "top largest account who produces $50,000 to $150,000 annually are avid skeet shooters [sic]." (*Id.*).

Plaintiff suffers from coronary artery disease and high cholesterol. Although Plaintiff has been prescribed virtually every cholesterol-lowering drug, he had to discontinue them due to serious side-effects. Consequently, Plaintiff's doctors have attempted to lower his cholesterol with diet and exercise, however they have met with little or no success. Prior to 2004, Plaintiff suffered three heart attacks, and had four separate angioplasty procedures. The last heart attack was in August 2003.

On June 5, 2004, Plaintiff stopped working, purportedly due to his ongoing coronary artery disease and job-related stress. In that regard, on October 4, 2004, Plaintiff's primary care physician, Bruce Peyser, M.D. ("Peyser"), stated:

> Bill remains very symptomatic in regards to a variety of medical problems including coronary disease, peripheral vascular disease, anxiety, depression, sleep disturbance, right shoulder pain, and right arm numbness.
> ***
> Bill is disabled and he cannot work. His situation is not stable. I have emphatically recommended that he not return to his work site. If he does return to his work site, especially if the above stated items are not addressed properly, it will put him at tremendous risk for future problems that could include another heart attack, a stroke, or limb threatening vascular insufficiency to his lower legs.

---

[1] After reviewing the foregoing information, Defendant observed: "This is a sedentary occupation, *however driving to attend networking events and meetings with clients within the home would be essential.* Occasional walking and standing may be involved when traveling outside of the office setting." (CLICNY 0021) (emphasis added).

(CLICNY 0424-25). Peyser noted that Plaintiff was having occasional periods of chest discomfort, shortness of breath, and dizziness, and decided to refer Plaintiff to a psychologist for "issues with anxiety and stress." (*Id.* at 0468). Peyser concluded that Plaintiff's "job was very stressful and I think may have even contributed to his medical problems. I will not allow him to return to his work site. It is the wrong decision and it will lead him to have another heart attack. He is totally restricted from confrontation or stressful situations." (*Id.* at 0157). However, Peyser indicated that Plaintiff could lift 10 pounds occasionally, could sit frequently, and could stand and/or walk occasionally. (*Id.* at 0458).

Plaintiff's cardiologist, Gerald M. Gacioch, M.D. ("Gacioch"), indicated that Plaintiff's coronary disease was "stable," though his ejection fraction was below normal. (*Id.* at 0256-57, 0330). Gacioch further indicated that Plaintiff needed to exercise, lose weight, and reduce his stress. (*Id.*). Another cardiologist, Thomas A. Pearson, M.D., Ph.D., stated that Plaintiff had "early coronary disease and high risk for another event," and "combined hyperlipidemia which is currently in poor control." (*Id.* at 02612).

Plaintiff's treating psychologist, Jeffrey C. Levenkron, Ph.D., ("Levenkron"), stated that stress was contributing to Plaintiff's cardiac problems and hindering his efforts to make necessary lifestyle changes. Levenkron's diagnosis was, in relevant part, "depressive disorder" and "probable mixed personality disorder with obsessive-compulsive and narcissistic traits." (*Id.* at 0390). Levenkron observed that Plaintiff worked in a pressure-filled environment and that if he returned to work without making necessary behavior changes, it would increase his chances of having another cardiac incident. (*Id.* at 0382, 0389).

4

Because of his health issues, Plaintiff took a variety of prescribed medications with various side-effects. For example, both Plaintiff and Peyser noted the effect of the drug Lorazepam, which Plaintiff was taking, on his ability to drive. (*Id.* at 0347) ("I have been taking Lorazepam .05 mg 3-4 times per day and am advised not to drive."); (*Id.* at 0156) ("[Mr. Chapman] most recently was started on anxiolytic medication, which includes Lorazepam. I would note that that medication was prescribed for him to take up to several times a day as needed. As I am sure you are aware, if an individual is taking Lorazepam, they should not drive and it would be next to impossible for him to be mentally alert and to reach an office and work as a stockbroker while taking this medication.").

After Plaintiff applied for long-term disability benefits, Defendant sought the opinions of two independent medical sources, a non-treating physician and a non-treating psychologist, both of whom based their opinions on their review of Plaintiff's medical file. Gary P. Greenhood, M.D. ("Greenhood") concluded that Plaintiff suffered from "residual coronary artery disease" that was not sufficiently severe to preclude Plaintiff from performing "sedentary work." (*Id.* at 0146-0152). John P. Shallcross, Psy.D. ("Shallcross"), observed that Plaintiff was "anxious and dysthymic," with "significant obsessive and somatoform traits," with no evidence of malingering. (*Id.* at 0144). In a report dated October 11, 2005, Shallcross indicated that Plaintiff was unable to work, due to the combination of his medical and psychological problems, though he expressed the view that Plaintiff's "psychiatric impairment would subside once his physical condition . . . stabilized and improved." (*Id.*). Shallcross noted that there was

> considerable consistency between both the physical providers and the mental and nervous treaters. The claimant would be limited by his obsessiveness,

5

anxiety, depression, possible reduction of concentration and may be restricted (according to his physical providers) by a risk to his safety should he return to a high pressure work situation.

(*Id.* at 0144). Shallcross, though, subsequently reading Greenhood's report, submitted an addendum, stating in relevant part:

> The fact that the claimant did not lack functional capacity to perform sedentary work . . . from a physical standpoint significantly alters [my previous] conclusions . . . . Prior to receipt of Dr. Greenhood's review, it appeared that a combination of physical and psychiatric impairments precluded work capacity for this claimant. Subsequent to the determination that there was no significant primary physical impairment it is evident that the secondary psychiatric impairment would not be of a severity to preclude all work capacity own occupation [sic] for the period in question.

(*Id.* at 0137).

Notably, both Greenhood and Shallcross were working under the mistaken notion that Plaintiff's job title was most accurately described as that of "Senior Vice President, Financial Institution," Dictionary of Occupational Titles ("DOT") Code 186.117-078. (*See, e.g.*, Shallcross Addendum, *Id.* at 0136: "The claimant is a 58-year-old Senior Vice President. His duties include providing investment management and consultation and direction and coordination to personnel of the activities of his department."). However, Defendant maintains that the job title "Registered Representative/Sales Agent", DOT Code 250.257-018, more accurately describes Plaintiff's occupation. (*Id.* at 0170). Moreover, Greenhood and Shallcross commented only on the exertional requirements of the job of Senior Vice President, which they described as "sedentary."

On November 2, 2005, Defendant denied Plaintiff's claim for long-term disability benefits, finding that Plaintiff's job was "sedentary work requiring minimal physical exertion." (*Id.* at 0112). Defendant based its decision on the opinions provided by Greenhood and

...

Shallcross. (*Id.* at 0114) ("Dr. Shallcross reviewed Dr. Greenhood's review and clarified that based [on] Dr. Greenhood's review and that [sic] there was *no significant primary physical impairment* that is evident that the secondary psychiatric impairment would not be of a severity to preclude *all work capacity*.") (emphasis added). Prior to Defendant's determination, Plaintiff had been found disabled and entitled to Social Security Disability benefits.

On August 31, 2006, Plaintiff commenced the subject action, and on July 13, 2007, he filed the subject motion for summary judgment. On December 20, 2007, counsel for the parties appeared before the undersigned for oral argument of the motion. The Court, having thoroughly considered the parties' written submissions and the arguments of counsel, now grants Plaintiff's application and remands the matter for further proceedings consistent with this Decision and Order.

## DISCUSSION

### Summary Judgment Standard

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment

against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996).

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249; *see also*, FED. R. CIV. P. 56(e)("When a motion for summary judgment is made and supported as provided in this rule, and adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993). The parties may only carry their respective burdens by producing evidentiary proof in admissible form. FED. R. CIV. P. 56(e). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Plaintiff brings this action to recover benefits pursuant to 29 U.S.C. § 1132. With respect to this statute, it is well settled that:

> "[A] denial of benefits challenged under [29 U.S.C.] § 1132(a)(1)(B) is to be reviewed [by a district court] under a de novo standard unless the benefit plan

8

gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Where the plan does grant discretion to the administrator, a court "will not disturb the administrator's ultimate conclusion unless it is arbitrary and capricious." *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir.1995).

*Tocker v. Philip Morris Companies, Inc.*, 470 F.3d 481, 487 (2d Cir. 2006). Under the arbitrary and capricious standard, the court must uphold the administrator's decision unless it is "without reason or erroneous as a matter of law," and "[w]here the plan participant and the plan administrator offer "two competing yet reasonable interpretations of [the plan]," [the court] must accept that offered by the administrators." *Id.* at 489 (citations omitted).

Under ERISA, "Plan administrators need not give special deference to a claimant's treating physician," although they cannot "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Paese v. Hartford Life Accident Ins. Co.*, 449 F.3d 435, 442 (2d Cir. 2006) (citations omitted). Moreover, where a claimant has been found disabled by the Social Security Administration, the court may consider that fact as some evidence of total disability under an ERISA plan. *Id.* ("The court acted well within its discretion when it considered the SSA's findings as some evidence of total disability, even though they were not binding on the ERISA Plan, and even though the SSA's definition of disability may differ from that in the [ERISA] Plan.").

As for a remedy, "if upon review a district court concludes that the Trustees' decision was arbitrary and capricious, it must remand to the Trustees with instructions to consider additional evidence unless no new evidence could produce a reasonable conclusion permitting denial of the claim or remand would otherwise be a 'useless formality.'" *Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995) (citations omitted).

9

In the instant case, the parties agree that the Court must apply the arbitrary and capricious standard of review. In doing so, the Court finds that Defendant's decision to deny benefits was arbitrary and capricious for several reasons. First, Defendant incorrectly based its decision upon a finding that Plaintiff could perform the exertional requirements of sedentary work generally, rather than on a finding that he could perform "all the essential duties of his occupation." In that regard, even assuming *arguendo* that Plaintiff's occupation is sedentary with regard to exertional requirements, Defendant did not consider "all the essential duties" of Plaintiff's occupation, such as the need to concentrate and handle stress while managing large sums of money.[2] Moreover, the record indicates that Salomon Smith Barney viewed Plaintiff essentially as an entrepreneur and independent sales person, who had considerable freedom to decide the best way to get and keep clients. Defendant should have considered that fact in defining Plaintiff's occupation, rather than merely looking at a DOT definition. *See, Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 253 (2d Cir. 1999) ("Though Kinstler's title at Project Return was 'Director of Nursing,' we agree with Judge Leisure that her 'regular occupation' may not be defined without some consideration of the nature of the institution where she was employed. Though her 'regular occupation' is not to be defined so narrowly as to include only the characteristics of her job at Project Return, it must be defined as a position of the 'same general character' as her job, i.e., a director of nursing at a small health care agency, as distinguished from a large general purpose hospital."); *see also, Shore v. Painewebber Long Term Disability Plan*, No.

---

[2]In his initial opinion, Shallcross stated that Plaintiff "would be limited by his obsessiveness, anxiety, depression, possible reduction of concentration and may be restricted (according to his physical providers) by a risk to his safety should he return to a high pressure work situation." (*Id*. at 0144).

10

04-CV-4152 (KMK), 2007 WL 3047113 at *12 (S.D.N.Y. Oct. 15, 2007) ("In reflexively using the DOT classification for [Plaintiff's occupation], Defendants clearly ignored the actual duties of Plaintiff's job and the institution where she was employed.").

With regard to the opinions of Defendant's medical experts, the Court notes that although Plaintiff's treating physicians uniformly concluded that a return to a high-stress work environment would be harmful to Plaintiff's cardiac health, Greenhood offered no opinion on that point. Defendant's failure to address that issue was arbitrary and capricious. See, Henar v. First Unum Life Ins. Co., No. 02 Civ. 1570 (LBS), 2002 WL 31098495 at *5 (S.D.N.Y. Sep. 19, 2002) ("[T]he administrative record as a whole reflects a disregard for the findings of plaintiff's treating cardiologist that plaintiff's coronary condition precluded subjecting him to the *mental stress* of being a Chief Financial Officer. . . . Because the administrative record does not reflect that defendant's experts adequately considered anything other than plaintiff's ability to deal with the *physical* aspects of his employment as Chief Financial Officer, we find that it does not support First Unum's finding that plaintiff was no longer disabled. The total failure to consider this factor renders that determination arbitrary and capricious.") (emphasis added).

Additionally, Shallcross' revised opinion, indicating that Plaintiff was capable of working, was based on the mistaken view that Plaintiff had no "no significant primary physical impairment." To the contrary, it is undisputed that Plaintiff suffers from coronary artery disease, which is made more difficult to manage by his inability to take cholesterol-lowering drugs. To the extent that Shallcross interpreted Greenhood's finding that Plaintiff could perform sedentary work to mean that Plaintiff did not have a significant physical

11

impairment, he was mistaken.[3] *See, e.g. Crowe v. Commissioner of Social Security*, No. 6:01-CV-1579(GLS), 2004 WL 1689758 at *5 (N.D.N.Y. Jul. 20, 2004) ("As the regulations and Social Security Ruling 96-9p point out, " '[s]edentary work' represents a significantly restricted range of work, and individuals with a maximum sustained work capability limited to sedentary work have very serious functional limitations.") (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 201.00(4) and SSR 96-9p.").

Finally, although Plaintiff is required to take numerous medications, such as Lorazepam, which apparently affect his ability to remain alert, concentrate, and drive a car, neither Greenhood nor Shallcross discussed the possible effects of those medications on his ability to perform the essential duties of his occupation.

Having determined that Defendant's decision to deny benefits was arbitrary and capricious, the Court will remand the matter to the Defendant Plan Administration Committee for further consideration of all the relevant facts. *See, Shore v. Painewebber Long Term Disability Plan*, 2007 WL 3047113 at *14 ("[H]aving found that [Defendant] arbitrarily and improperly defined Plaintiff's 'regular occupation,' it follows that [Defendant] has not fully considered whether Plaintiff was disabled from her 'regular occupation' as that term has been defined by the Second Circuit. . . . Thus, remand is appropriate to permit [Defendant] to evaluate Plaintiff's medical condition in the proper context of her 'regular occupation.'") (citations omitted); *see also, Henar v. First Unum Life Ins. Co.*, 2002 WL 31098495 at *4 (Defendant's failure to properly consider Claimant's ability to handle the

---

[3] *See*, Defendant's Memo of Law at 17)("Dr. Shallcross correctly noted that Chapman's claimed psychiatric impairment would subside once his physical condition had stabilized and improved. Since Chapman suffered from no credible <u>physical</u> functional impairment, the claimed psychiatric impairment had no support.")

12

mental stress of his occupation required remand for further consideration of that factor by Defendant).

## CONCLUSION

Plaintiff's motion for summary judgment [#10] is granted and this matter is remanded to the Defendant Plan Administration Committee for further proceedings consistent with this Decision and Order.

SO ORDERED.

Dated:   Rochester, New York
         January 9, 2008

ENTER:

*Charles Siragusa*
CHARLES J. SIRAGUSA
United States District Judge